UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 25-mj-130 |
| v. : | |
| : | |
| JOSEPH FARINA, : | |
| : | |
| Defendant. : | |

**UNITED STATES' MEMORANDUM IN
SUPPORT OF PRE-TRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion that Joseph Farina (hereafter, the "Defendant") be detained pending trial pursuant to 18 U.S.C. § 3142(f)(1)(A) (crime of violence).

On July 30, 2025, the Defendant was charged by Complaint with Distribution of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). At the Defendant's initial appearance that same day, the United States requested the Defendant's detention pending trial pursuant to the above-referenced provision of the federal bail statute. The Court scheduled the Defendant's detention hearing for August 5, 2025. Pursuant to 18 U.S.C. § 3143(e)(3)(E), there is a rebuttable presumption in favor of detention. Because the Defendant poses an unmitigable risk to community safety and cannot overcome the presumption, this Court should order that he remain detained pending trial.

I.  **Factual and Procedural Background**

The charges stem from the Defendant's use of his Signal account to distribute child sexual abuse material ("CSAM") to an undercover officer (hereafter, the "UC") on July 14, 2025. As further detailed below, after expressing his interest in watching CSAM with others and joining

1

groups for that express purpose, on July 14, 2025, the Defendant sent the UC a video of himself masturbating while watching a separate video of multiple adult males masturbating over a nude prepubescent child.

Specifically, on July 14, 2025, from a Washington, D.C. office, the UC lawfully monitored the cellular phone of a subject previously arrested in the District of Columbia in July 2025 (hereinafter, "SUBJECT 1"). Within the phone, the UC observed direct messages on Signal, beginning on or about June 10, 2025, between SUBJECT 1 and the user of Signal account "NCGuy"—later identified as the Defendant, as detailed *infra*. As shown in Figure A below, on June 10, 2025, the Defendant introduced himself to SUBJECT 1 as "Joseph" and advised he knew SUBJECT 1 from the chat application "Sniffies." In the message, the Defendant indicated that he and SUBJECT 1 had hung out the prior weekend:



*Figure A: Screenshot of June 10, 2025 Signal chat between SUBJECT 1 and Signal user "NCGuy"*

In further Signal messages from June 15 through June 18, 2025, the Defendant expressed an interest in CSAM and asked to join Zoom video calls with SUBJECT 1 and his "pedo buds." On July 8, 2025, the Defendant messaged SUBJECT 1 that he had been "watching more lately again," referencing CSAM based on the context of their conversation.

As noted above, SUBJECT 1 was arrested on or about July 1, 2025, and his phone was lawfully seized by law enforcement. Using SUBJECT 1's phone, on July 14, 2025, the UC

responded to the Defendant's last message to SUBJECT 1. In response, the Defendant sent the UC a video consisting of CSAM. Screenshots of this July 14, 2025 chat are shown below:



**Figure B: Screenshots of UC chat with Signal user "NCGuy" on July 14, 2025**

As promised, the Defendant then sent the UC a video on July 14, 2025, which depicted a nude adult male—who the Defendant identified as himself—with "Pedo" written across his

4

stomach and his erect penis visible. Figure C is a sanitized screenshot of the video the Defendant sent the UC.



Figure C:  Screenshot of the video the Defendant sent the UC on July 14, 2025

In the video, the Defendant was masturbating while holding a tablet device that, in turn, played a clearly visible video of multiple adult males masturbating over a completely nude prepubescent boy. The Defendant could be heard saying, "I fucking love watching child porn. Look at that little kid. Fuck, look at all those pedophiles surrounding that little kid with their big hard cocks. I want to be there right with them. I want to fucking fuck a little baby. I want to breed a little baby." He continues, "I fucking love child porn. I love pedophila. I always want to

be a pedo." The UC asked the Defendant if the adult male masturbating in the video was him, and the Defendant confirmed it was, elaborating, "This is my audition back into y'all's group haha."

On July 15, 2025, the Defendant told the UC, still monitoring SUBJECT 1's accounts, that he lived "in North Carolina Raleigh area," traveled up to Washington, D.C. "pretty often," and would be in Washington, D.C. at the end of July for a work conference. Although the Defendant initially indicated that he was unsure if he could meet with the UC (who he believed to be SUBJECT 1), the UC advised he had met a dad in Washington, D.C. with a nine-year-old boy.

The Defendant asked the UC whether he had seen the dad and his child play, and when the UC affirmed, the Defendant enthusiastically responded, as shown below in Figure D.



*Figure D: Screenshot of UC chat with Signal user "NCGuy" on July 15, 2025*

After the UC indicated that the dad had sexually abused the child and allowed the UC to do the same, the Defendant reconsidered, stating he could "carve out" some time to meet the UC. The UC promised to introduce the Defendant to the dad and explore the dad's openness to hanging

out with the Defendant; in turn, the Defendant sent the UC several pictures of himself—depicting his abdomen and penis—for the UC to forward to the dad.

The next day, on July 16, 2025, the Defendant advised he had changed his mind about the UC forwarding his pictures to the dad, stating, "Obviously I have these urges and will have to deal with that" . . . , "But I don't want to go down that path." On July 17, 2025, the Defendant asked the UC to delete the CSAM video that he previously sent on July 14, 2025, and the UC sent a screenshot documenting its deletion.

On July 27, 2025, the Defendant messaged the UC, advising he was in Washington, D.C. until Wednesday, July 30, 2025. They planned to meet on Tuesday, July 29, 2025, at 7:00 p.m. to watch videos together at an apartment building in Northwest Washington, D.C.

On July 29, 2025, at approximately 8:13 a.m., the UC messaged the Defendant to confirm they were still meeting. The Defendant responded, "Hornier today" and then stated, "Yeah I think me being horny is good for all parties involved." When the UC told the Defendant he was free after 6:30 p.m. and invited him to "come play cutie," the Defendant responded, "Yessir, Did you tell others are we zooming?" The UC advised there would be at least two others involved and again confirmed the Defendant was still coming at 7:00 p.m. The UC instructed the Defendant to "[j]ust text me when you get here and I'll let you up." At approximately 6:42 p.m., the Defendant advised, "I'm taking the train." At approximately 7:00 p.m., law enforcement surveilling the vicinity of the meeting location observed the Defendant walking east along the block where the building was located. The Defendant was observed looking at his phone in a manner consistent with checking addresses as he entered the block.

The Defendant continued to use his phone while approaching the building and walked up the stairs into the foyer of the building. At approximately the same time the Defendant was

observed using his phone, "NCGuy" sent the UC a message via Signal, "I'm here." The UC provided "NCGuy" the wrong code for entry, and "NCGuy" asked at 7:02 p.m., "How do you work it." Agents followed the Defendant into the vestibule and observed him attempt and fail to access the building using the callbox keypad before opening his phone to a messaging application. Notably, at the time "NCGuy" contacted the UC about using the callbox, law enforcement observed no one but the Defendant attempting to enter a code in the callbox.

Ultimately, law enforcement approached the Defendant in the foyer of the building and arrested him. At the time of his arrest, the Defendant held in his hand a cellular phone; when law enforcement seized the phone incident to the Defendant's arrest, they observed an application that resembled Signal running on the phone.

## II.     Legal Authority

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence.

Under 18 U.S.C. § 3142(e)(3)(E), the charged offense carries a rebuttable presumption that the Defendant presents a danger to the community and that no pretrial release condition or combination of conditions may be imposed to assure the safety of any other person and the community. This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir.

1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released").

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the section 3142(g) factors. *See United States v. Ali*, 793 F. Supp. 2d 386, 388 (D.D.C. 2011). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

### III. Analysis

Due to the charged offense, the Defendant is presumptively dangerous under Section 3142(e)(3)(E) of the Bail Reform Act.  The United States respectfully submits the Defendant cannot rebut the presumption in favor of detention, and there are no conditions of release adequate

to reasonably assure community safety. Therefore, this Court should detain the Defendant pending trial.

### A. Nature and Circumstances of the Offense Charged

First, the nature and circumstances of the offense weigh in favor of detention. The Defendant's conduct significantly harms our community by propagating and fueling demand for videos depicting the rape and sexual abuse of our community's most vulnerable members, young children. "Child pornography depicts pictorial evidence of physical sex abuse against and exploitation of children and the production and distribution of such contraband carries a multitude of harms." *United States v. Galarza*, No. 18-MJ-146 (RMM), 2019 WL 2028710, at *6 (D.D.C. May 8, 2019) (Howell, C.J.) (reversing release order); *United States v. Nickelson*, No. 18-MJ-102 (GMH), 2018 WL 4964506 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same); *United States v. Blanchard*, No. 18-MJ-101 (GMH), 2018 WL 4964505, at *4 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same). This would be true even if the Defendant had simply possessed CSAM. Here, however, the Defendant distributed CSAM under circumstances that clearly demonstrate his interest in perpetuating the demand for CSAM by connecting with others interested in the same. Specifically, on July 29, 2025, when he was arrested, he had arranged to meet with the UC for the explicit purpose of watching CSAM. Moreover, he was initially enticed by the opportunity to meet a father who had abused his nine-year-old child and had purportedly permitted the UC to do the same.

Children captured in images and videos depicting their sexual abuse are significantly harmed when the images and videos are created, and their re-victimization occurs whenever an individual, such as the Defendant, views and shares these images for his own and others' sexual gratification. *See Galarza*, 2019 WL 2028710, at *6 (noting that "'the perpetual nature of child

pornography distribution on the Internet causes significant additional harm to victims,' [who] 'live with persistent concern over who has seen images of their sexual abuse' and how those images are being used to cause additional harm.'" (quoting U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES (Dec. 2012) at vii); *Nickelson*, 2018 WL 4964506, at \*4 (same); *Blanchard*, 2018 WL 4964505, at \*4 (same).

Indeed, the gravity of the offense is reflected in Congress's assessment that individuals charged with distributing child pornography should be presumed detained pending trial, *see* 18 U.S.C. § 3142(e)(3)(E), and upon conviction, are subject to a five-year mandatory minimum term of imprisonment and the statutory maximum sentence of up to 20 years' incarceration, *see id.* § 2252(b)(1).

### B. The Weight of the Evidence Against Defendant

The strong evidence against the Defendant similarly weighs in favor of detention. Where, as here, "the government possesses overwhelming evidence that the defendant is guilty of the crime charged—and the nature of the charged offense involves a danger to the community—then the second factor will help meet the government's burden of persuasion." *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018).

As described above, the United States is in possession of the Defendant's Signal messages, including his July 14, 2025 message sending a video involving CSAM to the UC. Further, "NCGuy," the Signal account that distributed CSAM, is plainly linked to the Defendant. On June 10, 2025, "NCGuy" identified himself by the Defendant's first name, "Joseph." And consistent with "NCGuy" and the UC's plan to meet on July 29, 2025, the Defendant arrived at the prearranged meeting location at the predetermined time, 7:00 p.m. As law enforcement observed the Defendant using his phone, "NCGuy" messaged the UC he was there. "NCGuy's" message

asking the UC how to use the callbox coincided with both his receipt of the wrong code and law enforcement's observation of the Defendant attempting and failing to use the callbox keypad to enter the building. Notably, at that moment, no one else attempted use of the callbox to enter the building. Once arrested, law enforcement seized the Defendant's phone, whereupon they observed an application that resembled Signal running on the phone. Indeed, the Signal account name "NCGuy" corresponds with the Defendant's current residency in North Carolina.

### C. The Defendant's History and Characteristics

The United States respectfully submits that the third factor concerning the Defendant's history and characteristics also weighs in favor of detention. Although the Defendant is young, has no criminal history, and is educated, he also appears to have such an overpowering interest in child pornography that he was driven to seek out and find a community of like-minded individuals. Moreover, it appears that the Defendant's interest and conduct appears to be escalating. For example, on June 10, 2025, the Defendant communicated to the UC: "I think I wanna try staying this time going deeper etc . . . The urges don't go away just bc I want them to ha." *See* Figure A. What's more, his compulsive urges potentially extend beyond viewing or disseminating CSAM. Indeed, the Defendant's interest in "going deeper" is reflected in his statements within the CSAM video depicting multiple adult males masturbating over a prepubescent child—to wit, the Defendant professed, "I want to be there right with them. I want to fucking fuck a little baby. I want to breed a little baby." And on July 15, 2025, once the UC divulged both his purported access to a dad with a sexually abused child and his willingness to introduce the Defendant to the father, the Defendant affirmatively elected to meet both while in D.C. Although the Defendant later reversed course to his credit, the context surrounding the Defendant's initial decision to meet the UC and dad, combined with the nature of the photographs he sent the UC to forward to the dad,

are incredibly concerning and indicative of the risk he poses to the community. Nonethless, he persisted in his plan to meet the UC and others to watch CSAM together while in D.C. and affirmatively took steps to do so.

Put simply, it is reasonable to infer from the sum of the Defendant's conduct and statements that the Defendant's offense conduct was neither aberrational, nor a momentary lapse in judgment. Rather, it appears to part of a pattern of conduct the Defendant has consistently engaged in. Prior to sending CSAM to the UC on July 14, 2025, his conversations with SUBJECT 1 make clear he has continued to seek out such content and to network with likeminded individuals. Moreover, it appears that the Defendant has considered his own willingness to engage in hands-on abuse. Thus, his lack of significant criminal history and any other mitigating circumstances are eclipsed, or at the very least offset, by the Defendant's criminal conduct and his other characteristics.

        D.       **Danger to the Community**

The nature and seriousness of the danger to any person or the community posed by the Defendant's release points squarely towards detention. That the Defendant poses a danger to the community is presumed by statute, *see* 18 U.S.C. § 3142(e)(3)(E), and should be factored into the Court's analysis, even if contrary evidence is presented. *See Ali*, 793 F. Supp. 2d at 388. And as discussed above, the dangers concomitant with the Defendant's conduct cannot be understated—the distribution of child pornography results in severe mental, emotional, and physical trauma to the children victimized by offenders, such as the Defendant, who seek sexual gratification through viewing and sharing of images depicting the sexual abuse of children. It is precisely "[t]hese significant harms and dangers [that] animated the Congress to create the statutory presumption of detention in these cases." *Galarza*, 2019 WL 2028710, at *7

Release conditions cannot sufficiently mitigate this danger and prevent the Defendant from covertly reengaging in the offense conduct. Given "the uniquity of internet-capable devices[,]" the challenges in fashioning release conditions to mitigate the danger the Defendant's release presents are "insurmountable[.]" *See United States v. Dhavale*, 2020 WL 1935544, at *5 (D.D.C. Apr. 21, 2020). This is particularly true in a case such as this, where it is clear the Defendant appears to have multiple connections to other like-minded individuals. Similarly, the United States is skeptical that a third-party custodian can adequately monitor and enforce release conditions for 24 hours every day to prevent the Defendant from any internet access.

### IV. Conclusion

For the foregoing reasons, the United States respectfully requests that the Court issue an Order granting its Motion that the Defendant be held without bond pending trial.

>Respectfully submitted,
>JEANINE FERRIS PIRRO
>UNITED STATES ATTORNEY
>
>By: */s/ Sitara Witanachchi*
>SITARA WITANACHCHI
>D.C. Bar Number 1023007
>ANDREA DUVALL
>AR Bar Number 2013114
>Assistant U.S. Attorneys
>United States Attorney's Office
>601 D Street NW
>Washington, D.C. 20530
>Telephone: (202) 252-2420
>Sitara.witanachchi@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a copy of the foregoing to be served upon counsel of record via the Electronic Case Filing (ECF) system on August 4, 2025.

By: */s/ Sitara Witanachchi*
Sitara Witanachchi
Assistant United States Attorney