## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.** 25-CR-232 (RCL) |
| | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JOSEPH FARINA,** | : | |
| | : | |
| *Defendant.* | : | |

### DEFENDANT JOSEPH FARINA'S MOTION IN SUPPORT OF PRETRIAL RELEASE AND MEMORANDUM IN SUPPORT THEREOF

Joseph Farina, by and through undersigned counsel, respectfully requests that the Court release him on bond pursuant to the Bail Reform Act, 18 U.S.C. § 3142 and *United States v. Salerno*, 481 U.S. 739 (1987). Under § 3142(b), the Court "shall order the pretrial release of [Mr. Farina] on personal recognizance . . . unless" no conditions of release would reasonably assure his appearance at court and the safety of the community. Here, the government does not argue that Mr. Farina is a flight risk. It is therefore the government's burden to show by clear and convincing evidence that no combination of conditions can assure the safety of the community. The government has not and cannot meet that burden here. As outlined below, Mr. Farina has no criminal record, exceptional family and community support, and a robust and workable proposed combination of strict release conditions that will reasonably assure both his appearance in court and the safety of the community.

### BACKGROUND

The government initially charged Mr. Farina by complaint on July 30, 2025 with Distribution of Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1), stemming

from an alleged offense committed on July 14, 2025. At his initial appearance, the government requested that Mr. Farina be detained pending trial, and the Court scheduled a detention hearing for August 5, 2025. The Court continued the detention hearing at the request of his initial, appointed counsel, to August 15, 2025. On August 12, 2025, a grand jury returned a single-count indictment on the same charge of Distribution of Child Pornography. Undersigned counsel was retained on August 11, 2025, and moved to continue the detention hearing for approximately three weeks in the interests of justice, which the Court granted.

## ARGUMENT

### I.    Legal Standard

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). The Supreme Court has explained: "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Salerno*, 481 at 755; *see also United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose."). "Nothing in this section shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. § 3142(j). As a general rule, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id*. at 1405.

2

Congress has not required mandatory detention for any offense. Rather, some offenses, like this one, contain a rebuttable presumption of detention. The Bail Reform Act imposes a "burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alitishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). That burden is "not heavy" and only requires production of "some evidence*." United States v. Busamante-Conchas*, 557 Fed. Appx. 803, 806 (10th Cir. 2014). That evidence includes "[a]ny evidence favorable to a defendant that comes within a category listed in § 3142(g) . . ., including evidence of their marital, family and employment status, ties to and role in the community, clean criminal record and other types of evidence encompassed in 3142(g)(2)." *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986).

When the presumption of detention is rebutted, it is the government's burden to demonstrate either by a preponderance of the evidence that the defendant is more likely than not to flee, or by clear and convincing evidence that preventative detention is necessary to ensure the safety of the community. *See United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) (Breyer, J.). Under the Bail Reform Act, the Court must consider the following factors when determining whether the government has presented sufficient evidence that Mr. Farina be detained: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the person charged; and (4) the nature and seriousness of the danger posed by the person to any person in the community if he is released. 18 U.S.C. § 3142(g).

## II. Analysis

1. *The nature and circumstances of the offense are no more serious than other cases where defendants have been released for comparable or more egregious conduct.*

The sole charge in this case stems from an alleged conversation between Mr. Farina and an undercover officer that took place over an instant messaging platform. The government alleges that during that conversation, Mr. Farina sent a selfie-style video recording of himself to the undercover officer in which CSAM was visible on a tablet that Mr. Farina was holding. The government does not allege that Mr. Farina uploaded CSAM to any websites or servers, nor that he directly transferred the CSAM to the undercover officer or anyone else. While not contesting that the alleged offense is a serious one, this Court has released defendants charged with comparable or more egregious offenses when appropriate release conditions could be implemented. *See United States v. Willis*, 22-CR-241 (D.D.C. 2022) (Court upholding release of defendant charged with coercion and enticement of a minor and transfer of obscene material to minors to the custody of two third-party custodians—the defendant's parents) (Howell, C.J.); *United States v. Peska*, No. 19-CR-350, ECF No. 5 at 10 (D.D.C. 2019) (Court released defendant charged with receipt of child pornography and accessing child pornography with intent to view despite government's allegation that the defendant "spent hours each day, while at work over a none-month period, searching for, accessing, viewing and receiving violent, graphic images of young children being sexually assaulted"); *United States v. Johnson*, No. 20-CR-083, ECF No. 1 at 3 (D.D.C. 2020) (Court released defendant charged with distribution of child pornography when government alleged that defendant shared suspected CSAM on a peer-to-peer ("P2P") network, knew how such P2P networks worked and knew it was possible for others to download files from his computer via the file-sharing network); *United States v. Donte Mintz*, No. 21-MJ-519, ECF No. 8 at 1 (D.D.C. 2021) (Court released defendant charged with distribution of child pornography and access with intent to view child pornography despite allegations that the defendant's alleged distribution and downloading of CSAM was

"prolific" and law enforcement had received information from four different sources that the defendant was distributing CSAM); *United States v. Oglesbee*, Case No. 22-CR-177, ECF No. 10 (D.D.C. 2022) (defendant charged with travel with intent to engage in illicit sexual conduct released to conditions requiring him to stay away from all minors and not use computers or other internet capable devices).

In its memorandum in support of pre-trial detention (ECF No. 7), the government (at 12) relies on three cases denying (or reversing) release, but each involves allegations far more serious and egregious than the instant case. In *United States v. Galarza*, No. 18-MJ-146, 2019 U.S. Dist. LEXIS 77710 at *1-2 (D.D.C. May 8, 2019), the government charged the defendant with distribution of child pornography and alleged that the defendant uploaded more than 500 videos and downloaded approximately 174 videos from an overseas website dedicated to the advertisement and distribution of child pornography and, separately alleged that the "defendant surreptitiously recorded a minor in her bathroom and bedroom, used those recordings in an attempt to extort her for additional videos, crawled into bed with the same minor on multiple occasions when she was 12 years old, and threatened to rape the minor's adult sister." Along with the more serious allegations of hands-on abuse, the Court also found that the proposed release conditions were insufficient because "[t]he defendant has shown a high level of sophistication with computers and electronic devices, [as evidenced by him] building his own [Redundant Array of Independent Disks] configured computer, hacking CW1's computer to commandeer her web camera, and the use of Tor anonymizing software and bit coin mixers to conceal his activities." *Id.* at *20-21

Likewise, in *United States v. Nickelson*, No. 18-MJ-102, 2018 U.S. Dist. LEXIS 176514, at *2 (D.D.C. Oct. 15, 2018), the defendant was charged with distributing, conspiring

to distribute, and advertising to offer to distribute child pornography. The government alleged that the defendant sent an undercover officer a Dropbox folder containing twelve child pornography videos, separately sent the undercover officer multiple videos of a female of unknown age masturbating, and separately invited the undercover officer to a messaging group consisting of ten users, who exchanged CSAM. *Id.* at *3-4. The government further alleged that the defendant later became an "administrator" and "owner" of the group, encouraged others to distribute CSAM via the group, re-uploaded the same Dropbox link containing twelve videos to the group, threatened other users with removal from the group if they did not upload additional CSAM, which led one user to post 23 Dropbox folders and other websites containing over 6,500 files depicting child pornography. *Id.* at 4-5

Last, in *United States v. Blanchard*, No. 18-MJ-101, 2018 U.S. Dist. LEXIS 176510, at *3-4 (D.D.C. Oct. 15, 2018), the government charged the defendant with distribution of child pornography and alleged that the defendant sent an undercover officer a link to a website with dozens of files of child "erotica," and three videos of child pornography. The defendant was also alleged to have invited the undercover officer to a private instant message group where users were exchanging multiple links to and/or images of child pornography. *Id.* at *4. The government also alleged that a forensic examination of one of the defendant's cell phones contained 36 stored images of CSAM. *Id.* Finally, the government provided notice of the defendant's prior conviction for cyberstalking where the defendant engaged in sexually explicit conversations with an undercover officer posing as a 15-year-old girl and arranged to meet the girl to have sexual relations. *Id.* at *5.

Suffice it to say, the government's allegations here do not rise anywhere near the level of the cases on which it chiefly relies to support detention. Unlike in *Galarza*, *Nickelson*, or

*Blanchard*, there are no allegations that Mr. Farina engaged in hands-on abuse, exercised leadership in online groups trafficking in CSAM, distributed material to a broad network of users, or employed technological sophistication to conceal or expand his conduct. Instead, the government alleges only a single video sent in a one-on-one exchange, with the CSAM visible indirectly on a device in Mr. Farina's possession. Mr. Farina has no prior criminal history, no history of inappropriate contact with minors (online or otherwise), and no demonstrated ability to circumvent monitoring or restrictions.

Indeed, even in the line of cases where this Court has permitted release, the underlying conduct was often more serious than what is alleged here. Yet in those cases, courts determined that carefully tailored conditions, such as third-party custodianship, electronic monitoring, and strict restrictions on internet use, were sufficient to reasonably assure community safety. The same conclusion follows here. Although the allegations are serious, their limited nature places this case on the least aggravated end of the spectrum, strongly favoring release under robust conditions

### 2. *The weight of the evidence is not unusual in this case.*

While the government relies on the weight of the evidence in this case as a basis to detain Mr. Farina, the strength of the government's evidence is just one factor and must be evaluated against the presumption of innocence. Mr. Farina is innocent until proven guilty, and placing undue weight on the strength of the evidence risks undermining that critical constitutional protection. Indeed, "[e]ven overwhelming evidence of guilt would not, alone, meet [the clear and convincing test.]" *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018). Here, the remaining factors—Mr. Farina's lack of criminal history, his deep family and

community ties, and the stringent conditions of release available to the Court—overwhelmingly favor release.

### 3. *Mr. Farina's history and characteristics favor release.*

Mr. Farina is 25 years old and the fourth of six children. He grew up in Wilmette, Illinois, where he was an avid soccer and lacrosse player, as well as a skilled saxophonist and flutist. He graduated from high school in 2018.



Mr. Farina excelled academically. After high school, he took a gap year ▇▇▇▇▇▇▇▇ before enrolling at Georgetown University. He graduated in 2023 with dual degrees in Biological Physics and Science, Technology, and International Affairs. He earned *summa cum laude* honors, served as President of the Society of Physics Students, and worked as a teaching assistant in multiple

courses. He completed a senior thesis and was awarded two NASA DC Space Consortium grants, along with two additional innovation and public-service grants from Georgetown.

Mr. Farina was also deeply committed to community service. He served as President of Georgetown's Homeless Outreach Programs and Education ("HOPE"), where he advocated for housing policy reform and organized direct service projects. He volunteered with the Hypothermia Outreach Team, leading groups of students in distributing blankets and supplies to unsheltered individuals during freezing weather. ████████████████████████████
████████████████████████████████████████████████ The COVID-19 pandemic intensified his isolation, cutting him off from peers and community at a critical stage.

In the fall of 2023, Mr. Farina enrolled in Duke University's Master of Science program in Medical Physics, pursuing dual tracks in Radiation Therapy and Nuclear Medicine. He excelled in his coursework and research, particularly in engineering and application of cancer-treatment modalities, and aimed to build a career as a medical physicist serving cancer patients. While at Duke, he also founded the university's first LGBT Catholic Ministry, reflecting his commitment to advocacy and inclusion. In recognition of his achievements, Mr. Farina was admitted to a highly competitive joint Ph.D. program in Radiation and Pharmacology at Duke, which he was scheduled to begin in August 2025.

Mr. Farina's history and characteristics are highly relevant to the Court's detention analysis. ███████████████████████████████████████████
██████████████████████████████████████████████████
His extraordinary academic achievements and record of community service demonstrate his resilience, intellectual ability, and commitment to constructive pursuits that benefit society as a whole.

These two aspects of Mr. Farina's history, when taken together, support release rather than detention. ██████████████████████████████████████████ ██████████████████████████████████ ████████████████████████ ████████████████████████████████████ At the same time, his success at Georgetown and Duke, his leadership roles, and his acceptance into a Ph.D. program demonstrate that he has the compacity to thrive when supported by a structured environment.

In Mr. Farina's case, robust conditions, including third-party custodianship by a supportive group of family members, mental health treatment requirements, strict electronic monitoring, and restrictions on internet access, can reasonably assure the safety of the community while also addressing his individualized needs.

Mr. Farina's background and characteristics are not those of a repeat offender or a sophisticated criminal actor. It is the background of a young man who has faced significant personal struggles, and yes he has proved he can succeed at the highest levels of academic and civic life. And not just for his own benefit, but in service of others. In short, Mr. Farina is precisely the kind of defendant for whom a carefully tailored release plan, rather than pretrial detention, is most appropriate.

4. **Mr. Farina's release would not pose a danger to any person or the community because the Court can impose a robust set of conditions that will reasonably assure community safety.**

The government has not and cannot provide a clear and convincing basis to support a finding that Mr. Farina would be a danger to the community if released. First, the "dangerousness" assessment "does not turn on any generalized, backward-looking assessment of the offender or the crime." *United States v. Munchel*, 991 F3d 1273, 1286 (D.C. Cir. 2021) (Katsas, J., concurring)

"Instead, it turns on a specific, forward-looking assessment of whether" the defendant "currently pose[s] an unmitigable threat to public safety." *Id.*

Here, there are conditions of release, the combination of which can reasonably assure the safety of the community. Mr. Farina's parents can rent a 2-bedroom apartment somewhere within approximately a thirty-minute drive of Wilmette, where Mr. Farina can be on home confinement in the custody of a group of third-party custodians. This proposal contemplates the third-party custodians working together to ensure that at least one of them remains with Mr. Farina in the apartment at all times.[1]

Assuming the Northern District of Illinois will provide courtesy supervision of Mr. Farina, the Court can impose some or all of the following conditions as part of this custodianship:

- Mr. Farina shall be released into the custody of a group of third-party custodians, which include his mother, father, and at least three other family members[2] who live in the northern suburbs of Chicago. The group of custodians will coordinate to provide continuous supervision.

- Mr. Farina will be on home confinement with electronic monitoring in a 2-bedroom apartment unit to be selected by his parents. The apartment will be located either in Wilmette, Illinois or within a thirty-minute drive of Wilmette.

---

[1]    A frequent government objection to third-party custodianship is the feasibility of one person essentially providing 24/7 supervision. The Farina family has put together a group of custodians to alleviate any concerns about potential gaps in supervision. While we are proffering a group of five individuals, it is worth noting that many more raised their hand to contribute to Mr. Farina's supervision.

[2]    As of the filing of this motion, the defense has proposed the following third-party custodians to Pretrial Services: David Farina, Julie Farina, Eileen Frank, Thomas J. Abraham III, and Maria Fisher.

- At all times, at least one of the third-party custodians will remain in the apartment with Mr. Farina.

- Mr. Farina shall not be permitted to leave the residence except to attend Court proceedings and to travel to any medical/ mental health appointments with the prior approval of the Pretrial Services office.

- No visitors, other than approved third-party custodians, shall be permitted in the residence.

- Mr. Farina shall not have access to the Internet, social media, a smart phone, or any device that is capable of accessing the internet.[3]

- A third-party custodian shall conduct a daily search of the home and ensure that Mr. Farina has no contraband or communications device, and the search shall occur at random times.

- Mr. Farina shall not be permitted to go outdoors, with the exception of a fenced-in backyard that is part of the apartment unit.

- Mr. Farina shall not have any contact by phone or other means with any person except for his third-party custodians, his legal team, and the Pretrial Services office. Mr. Farina must obtain permission from the Pretrial Services office to communicate with any licensed medical or mental health professional.

- The third-party custodians may acquire a "flip phone" (*i.e.,* a phone that is not capable of accessing the internet), for Mr. Farina to use to make approved phone

---

[3]    The defense proposes that each third-party custodian, when present in the apartment, may possess one smart phone. The smart phone shall be equipped with an alphanumeric password known only to the custodian, and at no time shall any custodian provide the smart phone to Mr. Farina or otherwise allow Mr. Farina to view any material on the smart phone.

calls. The third-party custodian shall make any approved phone calls and confirm their authenticity before providing the flip phone to Mr. Farina.

- All third-party custodians must immediately report any violations of the conditions of release to Pretrial Services.

- The third-party custodians, collectively, shall submit weekly compliance reports, via phone call, email, or text message, to Pretrial Services, confirming Mr. Farina's compliance with the conditions of release under penalty of perjury.

Taken together, these conditions provide a comprehensive, structured, and enforceable framework that addresses any concerns about community safety while simultaneously allowing Mr. Farina to access robust and ongoing mental health treatment, which he wishes to do and his family is willing and able to financially support. The combination of continuous supervision, restricted movement, mental health treatment, and regular reporting to Pretrial Services ensures that he will be closely monitored while also receiving the care necessary to manage his documented mental health challenges. With such safeguards in place, there is no basis to conclude that Mr. Farina would pose an unmitigable risk to the community if released.

**CONCLUSION**

For the foregoing reasons, and any additional reasons provided at the detention hearing, Mr. Farina respectfully requests that he be released pending trial, with appropriate conditions to assure the safety of the community.

Respectfully submitted,

/s/ Matthew Covert
Matthew Covert
D.C. Bar No. 1602150
Covert Jackson Yarbro PLLC
600 Massachusetts Avenue NW, Suite 250
Washington, D.C. 20001
mcovert@cjypllc.com
(202) 577-8172

*Counsel for Joseph Farina*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing to be served upon counsel of record via the Electronic Case Filing (ECF) system on August 4, 2025.

By:  /s/ Matthew Covert
Matthew Covert
D.C. Bar No. 1602150
Covert Jackson Yarbro PLLC
600 Massachusetts Avenue NW, Suite 250
Washington, D.C. 20001
mcovert@cjypllc.com
(202) 577-8172

*Counsel for Joseph Farina*